RUECKERT MEAT COMPANY (Plaintiff) Appellant,

v.

HARTFORD STEAM BOILER, INSPEC-TION AND INSURANCE COMPA-NY, (Defendant) Respondent.

No. 31299.

St. Louis Court of Appeals.

Missouri.

June 14, 1963.

Motion for Rehearing or to Transfer to Supreme Court Denied July 12, 1963.

John T. Sluggett, III, Clayton, for appellant.

Burton H. Shostak, and Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for respondent.

ANDERSON, Judge.

This is a suit on a policy of insurance issued by defendant to plaintiff, insuring plaintiff against loss and damage to its property through accident. The case was tried to the court and resulted in a finding and judgment for defendant. From said judgment plaintiff has appealed.

That part of the policy involved herein covered a refrigerating system at defendant's place of business in the City of St. Louis. The term "accident" was defined in the policy. The material part of the definition is as follows:

"1. A sudden and accidental tearing asunder of the Object, or any part thereof, caused by pressure of contents therein, * * * but cracking shall not constitute a sudden and accidental tearing asunder;"

On May 31, 1963, ammonia gas escaped from the refrigeration plant in that part of the system which was located in the fresh meat room on defendant's premises. The leak was discovered at about 5 A.M. on May 31, 1963. The ammonia was escaping

from a solenoid valve which had component parts described in the evidence as a "shell", "electric coil" and a "housing." The shell, which was metallic, tubular and stem shaped, was surrounded by the coil which fitted over the shell and rested around it. The housing enclosed the coil and shell. The system was kept under pressure of ammonia gas of 17 to 22 pounds per square inch. It was agreed at the trial that the atmospheric pressure at St. Louis is 14.55 pounds per square inch. About three days after the discovery of the leak, Michael G. Ames, a maintenance employee of plaintiff, removed the valve from the system and discovered a hole in the shell from which the ammonia gas escaped. It was stipulated at the trial that there had been a short of electricity in the coil which started boring the hole. The shell was also scarred and blackened around the hole by this burning. The hole went all the way through the shell.

Plaintiff contends that there was an accident within the meaning of that term as defined in the insurance policy. Its theory is that the electric arcing from the coil bore into the metal wall, at which point the wall became so thin that it was unable to withstand the pressure from within, and as a consequence, it blew out the remaining wall, thus permitting the ammonia gas to escape and damage plaintiff's property. Thus it is urged there was "a sudden and accidental tearing asunder" of a part of the refrigeration system "caused by pressure of the contents therein," which created liability under the policy.

Defendant contends that the loss was not caused by pressure from within, but by the burning and melting of the metal due to the electrical "short" in the coil.

Both parties offered evidence in support of their respective theories. Michael Ames, plaintiff's maintenance man, testified that he was familiar with the refrigeration equipment, assisted in its installation and had maintained it thereafter. He stated that he had experience with such equipment since he was 14 years old. He was 57 years of age at the time of the trial. He further testified that he disassembled the valve from the system and discovered the hole through which the ammonia had leaked. He was then asked what caused the trouble. He replied that the coil was shorted and had burned and weakened the valve stem " * * and the pressure, I guess, it just pushed out, is the only thing I know." "Q. * * * Now, Mr. Ames, you testified that the electrical current started boring this hole, and when the wall weakened the pressure then blew out? A. That's the way I can see it. * * * Q. Now, in your opinion, when the wall was weakened did the pressure within blow out the remaining wall? A. Well, that would be my theory of it, and the way I would look at it, the pressure blows out when its weakened."

John Schenk was then produced by plaintiff and testified that he was a graduate professional engineer, and had been engaged in his profession since 1934; that he was employed by the Alco Valve Company, the manufacturer of the valve in question, and that at plaintiff's request had visited plaintiff's premises and familiarized himself with said valve and the refrigerating system in plaintiff's place of business. He testified that the gauges used in refrigerating plants such as plaintiff's, measure pressure therein above the outside atmospheric pressure, which is considered zero, and that if the gauge indicates 22 pounds per square inch pressure, actually such pressure would be 22 pounds per square inch above the existing atmospheric pressure. He further testified that the short in the coil would cause such intense heat that it would melt the metal of the valve shell, which process, in this case, was of short duration. He then gave the following testimony:

"Q. Now, assuming, Mr. Schenk, that this arcing process was taking place in a very short period of time as you have described, and assuming further that the pressure within the system, within the valve and within the shell in question, was somewhere between * * * 17 pounds and 22

pounds pressure per square inch, in excess of the atmospheric pressure without, do you have an opinion as to whether or not when the wall was weakened, as you have testified, the pressure would then seek to blow out and neutralize itself with outside atmospheric pressure?

"A. I think it's quite natural and it follows that as the melted metal gets to the very thin wall that the resultant pressure would burst a semi-plastic material, the thin wall left.

"Q. Would the pressure within rush out through the resulting oriface?

"A. Yes, sir.

"Q. And in your opinion is that what happened in this instance?

"A. It appears to be."

On cross-examination the witness testified that the arcing in this case was of sufficient heat to melt metal, and would melt the metal all the way through the shell, if it continued and was of sufficient intensity, if the fuse didn't blow. He further testified that whether pressure coming through would leave evidence thereof on the outside would depend upon whether the arc continued; that if it continued, it would melt and blow clean; that if something comes out it would cause the metal when hot to push outwardly along the edges of the hole and show that pressure had gone through the metal; that there would be evidence on the outer side. He stated, "I might say that may happen or not, depending on whether the arc continued, and we are talking here in terms of very small fraction of a second, hundred thousandths of a second. It could be if the arc was stopped at a point you would have that, and if it continued it would melt and blow clean."

Chris J. Basso testified for the defendant. He was an inspector for Hartford Steam Boiler, Inspection and Insurance Company. His job involved inspection of boilers, refrigeration units and all types of machinery. He visited plaintiff's plant and saw the refrigeration plant there which had been dismantled. The coil and housing had been removed from around the valve. He inspected the valve and found there had been a "short" in the coil itself which had burned a hole in the shell, which, in his opinion, had gone through the shell. He further stated that if there was pressure from within pushing out, there would have been an outward motion indicated in that area, and that, in his opinion, the hole in the valve was caused by the short circuit which melted the metal through the shell.

Ulric G. Horton also testified for the defendant. He was a supervisor and inspector for Hartford Steam Boilers, Inspection and Insurance Company, and had certain training with respect to the operation and inspection of refrigeration units, also the principles involved in the working of refrigeration systems. His first awareness of this controversy was when he visited plaintiff's attorney and was shown the valve, coil, and housing. He testified that the coil indicated a "short" of such intensity as to melt the metal shell; that a short from the coil would cause a hole to be burned all the way through the shell which would allow the ammonia to escape through this hole.

In our opinion, the plaintiff failed to show that the leak in the refrigeration system was caused by accident as that term is defined in the policy. Such a finding would rest on pure speculation and conjecture. It cannot be said, as plaintiff contends, that at some time during the boring of the hole by the electric arc there came a time when the wall of the shell at the point of burning became so thin that it "blew out" as the result of inside pressure. This is especially true when you consider the added outside pressure necessarily built up at said point by the intense heat, which according to the evidence, was sufficient to melt the metal of the shell. There was no evidence that

would justify an inference that the arcing stopped short of complete penetration of the shell, and that the pressure within thereafter ruptured the wall of the shell, and thereby became a concurrent proximate cause. Just the opposite was shown for it appears there was no evidence around the rim of the hole of the explosion, which would have been present had there been a sudden outward movement caused by pressure from within. In our opinion, the predominant efficient cause of plaintiff's loss was shown to be the electrical arcing, and was not a sudden accidental tearing asunder of any part of the refrigeration system caused by pressure of the contents therein. The judgment is affirmed.

RUDDY, P. J., and WOLFE, J., concur.